## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 17-10-LPS |
| | ) | |
| TORON O. CROCKER, | ) | |
| | ) | |
| Defendant. | ) | |

## THE GOVERNMENT'S POST-HEARING RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION ........................................................................................................ 1

BACKGROUND........................................................................................................ 2

   A. The Defendant Is Advised of His Miranda Rights and Agrees to Speak with the Agents. ............................................................................................ 3

   B. The Defendant Admits to Producing Child Pornography Early on in the Interview. ............................................................................................ 7

   C. The Defendant Expresses Concerns about Seeing His Children. ...................... 8

   D. The Agents Repeatedly Challenge the Defendant's Claim that He Did Not Distribute Pornographic Videos of His Daughters. .......................................... 13

   E. The Defendant's Asks about Leaving to "Get a Lawyer," but Repeatedly Declines to Make a Clear Request for Counsel.................................................. 16

ARGUMENT ............................................................................................................ 18

I.   The Defendant's Statement to Law Enforcement Was Voluntary.................. 18

   A. The Agents Did Not Use False Promises to Coerce the Defendant into Providing a Statement. .................................................................................... 20

   B. The Totality of the Circumstances Demonstrate that the Defendant's Statement Was Voluntary. .............................................................................. 25

II.   The Defendant Did Not Make a Clear and Unequivocal Request for an Attorney ........................................................................................................ 28

CONCLUSION.......................................................................................................... 29

# **INTRODUCTION**[1]

The defendant repeatedly molested his little girls for years.   On a number of occasions, he filmed this activity.   The process of admitting to this conduct was a difficult and emotional process at times, but it was a free choice that the defendant made after waiving his *Miranda* rights.

Nevertheless, the defendant argues that his statement to the FBI was an involuntary one.   In order for him to prevail, the Court must find that the agents were "so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess."   *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986).   The defendant contends that this standard is met here, alleging that the agents falsely promised that he would avoid arrest and be released to see his children if he consented to an interview.   (D.I. 50-1 at 6).   This argument is wrong.

The agents made no such representations.   While they repeatedly encouraged the defendant to tell his side of the story, it was with the understanding that the information could lead to potential leniency at a later time from a prosecutor, judge, or other third party.   Courts have repeatedly held that these types of representations do not raise voluntariness concerns.   And even if the defendant could have inferred a different meaning from some of the agents' remarks, other factors demonstrate that

---

[1] Based on the evidence adduced at the suppression hearing of January 7, 2020, the government does not anticipate any arguments not already contained in the defendant's Motion to Suppress (D.I. 50-1).   Thus, this memorandum largely tracks the government's pre-hearing response to that motion, but now includes cites to record.   The transcripts of the hearing are abbreviated "Tr."; government exhibits are referenced with the prefix "GX."

he was aware that his statements to law enforcement would have consequence.  He was over 30 years old, had prior experience with the criminal justice system and, most importantly, was advised of his *Miranda* rights at the onset of the interview. With these facts in mind, there is little support for the defendant's claim that his statement was the product of unconstitutional coercion.

The defendant also contends that the agents should have stopped the interview when he asked:  "So, could I leave to get a lawyer?"   (D.I. 50-1 at 14-18).  This argument likewise fails.  It is true that agents must cease questioning when a suspect makes a clear and unequivocal request for counsel.  *See Davis v. United States*, 512 U.S. 452, 459 (1994).  As the context of this statement demonstrates, however, this was not such a request.  Indeed, when the agents sought clarification – as the Supreme Court suggests in these circumstances – he repeatedly declined to ask for an attorney.  *Id.* at 461.

## **BACKGROUND**

 Operation Rescue Me is a program within the FBI that focuses on identifying victims of child pornography offenses. (Tr. 7).  As part of this program, Special Agent Michael Lipsner received two videos that were recovered from FBI investigations in Virginia and Georgia.  (Tr. 9).   In the first, a juvenile African-American female performs oral sex on an adult Africa-American male. (Tr. 9).  In the second, the same juvenile female is nude from the waist down and astride the same adult male's erect penis. (Tr. 9).

Based on his face and a distinctive chest tattoo, Agent Lipsner was able to

2

identify the adult male in these videos as the defendant.  (Tr. 9-11; GX. 1 (photo of defendant from video)).   The pre-pubescent girl in both videos was identified as the defendant's youngest daughter, who was 10 or younger at the time.  (Tr. 11).   Based on this information and other aspects of his investigation, Agent Lipsner obtained search warrants for the defendant's residence and person in early 2017.  (Tr. 14, 59).

At the time, the defendant was on probation in the State of Delaware and had a prearranged appointment to see his probation officer the morning of February 8, 2017.   (Tr. 12, 14, 57).   Since the probation office would provide a controlled environment for the next steps in his investigation, Agent Lipsner coordinated with personnel there to approach the defendant at that location.  (Tr. 14).

After the defendant arrived at the probation office on the morning of February 8, he was detained and brought to a conference room there.  (Tr. 15).   Since this was not a secure location, the agents placed the defendant in handcuffs and leg restraints – based in part on a request from the management at the facility.  (Tr. 16-17, 60). The agents then searched the defendant pursuant to the warrant, which entailed taking photographs of his body.  (Tr. 15, 61).    The defendant was nervous, but compliant during this process.  (Tr. 61, 64).

### A.    The Defendant Is Advised of His Miranda Rights and Agrees to Speak with the Agents.

After the search, the defendant consented to an interview with the agents.  (Tr. 18).   At the onset, the defendant was advised that he was being audio-recorded, and that he could take a break at any time.   (Tr. 18, 20-21; GX3 at 00:30 to 00:50 (interview recording).   After taking some biographical information, Special Agent

3

Lipsner read the defendant his *Miranda* warnings from an FBI FD-395 form.

> Lipsner:   Before we ask you any questions here, you have to understand your rights.   You have the right to remain silent.   Anything you say can be used against you in court. You have the right to talk to a lawyer to ask for advice before we ask you any questions.   You have a right to have a lawyer with you during questioning.   And if you can't afford a lawyer, one will be appointed to you before we ask you any questions, um, if you want one.   All right, do you understand those rights as I have read them to you?
> Crocker:   Yes.

(Tr. 21-23; GX3 at 2:08 to 2:38; GX4 (*Miranda* waiver)).

Agent Lipsner confirmed the defendant's educational level (he finished the 10th grade) and that he could read.  (GX3 at 2:38 to 2:44).  Then, after ensuring that the defendant was not under the influence of drugs or alcohol (GX3 at 3:07 to 3:15), Lipsner provided the defendant with a written copy of his *Miranda* warnings via the same form.  (Tr. 23).  He asked him to read each of the following provisions and, if he agreed and understood them, to sign the form at the bottom. (Tr. 23; GX3 at 3:57 to 4:11).

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

**CONSENT**

I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.

Signed: ⟩

(GX4).   At no point did the agents tell the defendant that his statements would not be used against him, or that if he gave a statement he would not be prosecuted.[2]  (Tr. 24).

After the defendant read the form and signed it (Tr. 23; GX3 at 4:15 to 4:35), he had the following exchange with the agents:

Crocker:        What if I say I want a lawyer?

---

[2] And the defendant knew from his prior experience that the opposite was true.   In late 2015, the defendant was arrested by the Delaware State Police.  (Tr. 12-13; GX2 at 00000894 (police report)).   In connection with that investigation, the defendant was read his *Miranda* rights, was provided a waiver form to review, and thereafter consented to an interview.  (Tr. 12-13; GX2 at 00000894).   After he provided an inculpatory statement to the investigating officer, the defendant was arrested, brought before a judge for arraignment, and subsequently remanded to the Howard R. Young Correctional Institution in lieu of bond.   (GX2 at 00000895).

| | |
|---|---|
| Moody: | We can't tell you otherwise, I mean that's entirely up to you. |
| Crocker: | Will I be locked up until I get a lawyer? |
| Lipsner: | Well, here's the thing . . . |
| Moody: | Asking for a lawyer doesn't get you arrested; it just means we can't have a conversation with you.  So, that decision is up to you.  Now, we're willing to talk to you.  We're willing to answer whatever questions we can. |
| Lipsner: | Before you, before you say that, I want you to hear what I have to say, and don't say a word.  All right.  If you decide you want to go that route, you have that right and we'll stop talking.  But, as I told you when you first encountered is that, we have that opportunity to hear your half of the story, and if you say that, we're done.  We're not going to talk.  I won't get a chance to hear your half of the story and we're going to have to let the facts stand as we see them, and make our recommendations based on that. |
| Crocker: | Yes, sir. |

(GX3 at 4:40 to 5:23; GX5 at 1 (transcript)).  Lipsner then reiterated that the choice was up to the defendant, but if he wanted to "go down that path," they would not be able to hear the defendant's side of the story:

| | |
|---|---|
| Lipsner: | So, you know, that choice is up to you.  I can't advise you whether or not to get a lawyer or to not get a lawyer.  You, you do have that right.  You're certainly entitled to that.  You know, and if that's something that you want, you go ahead and go down that path.  But, um, but I won't get a chance to hear your story, and the next time we talk – we may not get a chance to talk again, and the next time we do it will probably be in a very, very different environment than it is right now.  So, just something to think about, all right.  And I'm not going to advise you one way or another, so do you wish to continue to talk with us? |
| Crocker: | Yes. |

(GX3 at 5:23 to 5:53; GX5 at 1 (transcript)).  As Agent Lipsner explained, he said this to the defendant because he had "strong confidence" that, if they met again, it would

be in "some kind of controlled circumstance" – e.g., jail or a proffer room.  (Tr. 28, 70-71).

## B.    The Defendant Admits to Producing Child Pornography Early on in the Interview.

The defendant made a series of damaging admissions in the opening minutes of his interview.  (Tr. 29-30).  After waiving his *Miranda* rights, the defendant identified himself in a screenshot taken from one of the aforementioned videos.  (GX3 at 7:50 to 8:05).  He initially claimed that his daughter made the video, and that he took the camera away from her.   (GX3 at 10:00 to 10:17).  Knowing that the video demonstrated otherwise, Special Agent Lipsner became audibly frustrated and said the following:

| Lipsner: | You want me to play the fucking video for you?   We can go down this fucking path. |
|---|---|
| Crocker: | Yes. |
| Lipsner: | You want me to play it? |
| Crocker: | Yes. |
| Lipsner: | Not a fucking problem.  Let's play that video. |
| Crocker: | I'm being honest.  Please don't be upset, because I'm being honest with everybody. . . |
| Lipsner: | The question right now is not whether or not you're going to get in trouble; it's how much trouble you're going to get in. |
| Crocker: | Okay. |

(GX3 at 10:27 to 10:36).   After being confronted with the video, Crocker became emotional at several points, but admitted that he made the film when his youngest daughter was about "six or seven," and used a cell phone to do it.   (GX3 at 12:30 to 14:16).  He later admitted to engaging in this type of conduct with both girls.

7

The defendant claimed, however, that this was all his daughters' idea – and he never veered from this story.  (Tr. 53).   He stated that they initiated sexual contact with him when they were three (3) and five (5) by performing fellatio on him while he was asleep.  (GX3 at 14:21 to 14:52).   The defendant indicated that his oldest daughter would also climb on top of him "to pleasure herself."  (GX3 at 16:00 to 16:46). The defendant remembered that this type of conduct occurred "maybe every other month," or sometimes "every other week."   (GX3 at 21:26 to 21:33; GX3 at 1:36:00 to 1:38:00).   He also stated that there was a video from as recently as "three weeks ago" on his phone that he brought with him to the probation office.  (GX3 at 27:20 to 27:48).

So, from the onset of the interview, the defendant knew that he was in deep trouble with the law – and the agents told him so expressly.  (GX3 at 10:27 to 10:36 ("The question right now is not whether or not you're going to get in trouble; it's how much trouble you're going to get in."); GX3 at 1:15:06 to 1:16:20;  GX5 at 7 (transcript)).

### C.    The Defendant Expresses Concerns about Seeing His Children.

At no point during the interview did the agents promise the defendant that, if he gave a statement, he would be released to see his children.  (Tr. 31).   As set forth below, the agents explained that being truthful may help him see his daughters in the future, but in all likelihood, any contact would have to be supervised by a third party.

Approximately 37 minutes into the interview, the defendant asked if the girls' mother – with whom he no longer had a romantic relationship – would find out about

8

his activity.   He was concerned because she attempted to "take the kids away" from him in the past.[3]  (GX3 at 23:15 to 24:05).  Special Agent Lipsner explained that he may be legally required to tell the girls' mother, but that taking ownership over what he did "could" improve his chances of seeing his children again:

| | |
|---|---|
| Moody: | What about their mother?   She filed a complaint last January. |
| Crocker: | Mm-hmm. |
| Moody: | You know, you're aware.   Are you aware of that . . . |
| Crocker: | Yeah. |
| Moody: | . . .that there was a complaint filed?  Like, what's her knowledge of what's going on with you and the girls?   I mean, this has been going on for a long time. |
| Lipsner: | Well, in your words it's been going on since the little girls were about two and five years old is the first time that you can remember that they were, I mean they were both putting your penis in their mouth, when you were, woke up to it, in your words. |
| Lipsner: | So, how long, how long has mama known about this stuff? |
| Crocker: | She knew about it since I told her that first time, but she doesn't know that I, that they still like to jump . . |
| Lipsner: | . . .that they still like to do it . . . |
| Crocker: | . . . on me . . . |
| Lipsner: | Does she know that some videos were taken? |
| Crocker: | No. |
| Lipsner: | Okay. |
| Crocker: | She's gonna know now, ain't she? |
| Lipsner: | Well, she's gonna know that there's been some, some stuff that may have been going on 'cause it's similar to what you talked to her about.   That's what she's gonna know, okay. |
| Crocker: | I mean, you're not going to tell her about the videos or anything? |
| Lipsner: | Well, I don't know about that.   We may have to tell her, because legally, we may need to tell her. |
| Moody: | She's their mom. |
| Lipsner: | She's their mom and she has got to make sure that they're safe. |
| Crocker: | So, I'm never going to see my kids. |

---

[3] Approximately a year prior, the girls' mother filed a complaint against the defendant indicating that he may have sexually abused them.  (Tr. 33).

| | |
|---|---|
| Lipsner: | Listen, the question of whether or not you see your kids again is, this conversation is going well, and I'd encourage you to keep it going.  That could determine whether or not you see your kids or not. |
| Crocker: | But she's going to fight for it and [weeping] this is so embarrassing. |
| Lipsner: | Listen, our goal . . . |
| Crocker: | [weeping] |
| Lipsner: | Toron, you got to stay with me, brother.  The goal, the goal of us, all right, is two-fold.  We got two major goals out of this whole thing.  One, we got to make your kids safe again, but that's not good, that can't continue, and you know that right? |
| Crocker: | So, meaning . . . |
| Lipsner: | Just hear me out, hear me out.  So, the number one goal is make sure the kids are safe. . . that's first, that's the most important goal.  If we didn't get anything else done today, we need to make sure those two little girls are safe.  Second to that is we, I don't care what you see on the news, I don't care what you hear on the streets, all right I'm here to tell you right now, at the FBI, our main job in this is to make sure that the kids are safe, and that they grow up with good parents.  It is best for a child to have a good dad and a good mom. |
| Crocker: | So you're not going to take me from my kids . . . |
| Lipsner: | We understand that. |
| Crocker: | . . . Please. |
| Lipsner: | We want those kids to have a good male role model and we want them to have a good female role model, so they can grow up and can have a good mom and a dad that they love.  But this is not love.  I'm not going to lecture you on this, but this is not how you show love to your child.  And you love your kids because you're upset, all right, so I believe you.  I believe that you love those little girls.  And you would probably do anything for those little girls, wouldn't you? |
| Crocker: | I always do anything and everything for them. |
| Lipsner: | And I feel the same way.  So you and I are exactly the same.  I would do anything for the kids in my life that I love.  I would do anything for them.  So, this conversation right now is doing something for that. |

(GX3 at 36:54 to 39:25).

Later in the interview, the defendant returned to this topic. He surmised that, under the circumstances, he would "probably never be around [his] girls again." Task Force Officer Moody clarified that while he could not tell him what the "end result" was going to be, it was likely that any contact with his daughters would have to be supervised by a third party:

| | |
|---|---|
| Crocker: | So, I'll will probably never be around my girls again. |
| Moody: | I couldn't say that; I couldn't say that. Um, you know. You know, under the circumstances, I think, you know, you know, they have different types of visitation and things like that, I mean, but let me ask you a question, do you think under the circumstances with what's been going on for the past several years, right? Do you think that it's a good idea for you to have unsupervised privileges with your daughters? Honestly? |
| Crocker: | [crying] |
| Moody: | I mean, honestly? I don't know what the end results going to be as far as like, you know, visitation and you having access to your daughters . . . |
| Crocker: | So, it's going to have to be supervised? |
| Moody: | I don't know. What I'm saying is, I can tell you is I don't know what the end result is going to be as far as like, you know. The time you spend with your daughters, right, cannot be spent like that. And that's been happening for years, right? Where would the responsibility on law enforcement, courts, social services, everyone, to allow you unsupervised access to your daughters. Think about that. |
| Crocker: | [crying] |
| Moody: | Listen, you admitted this has been going on for years, right? So, how, if, if, if somebody lets you visit your daughters unsupervised, and your daughters as you describe, decide they want to give you a blow job, you don't have the mental capacity to say, "listen, this can't happen anymore," right? |
| | [Crocker weeping] |
| Moody: | Think about that. I mean, that's not up for us to decide. That's not up for us to decide. I couldn't say. I'm just asking you, do you think . . . |
| Crocker: | Yes. |

| | |
|---|---|
| Moody: | . . . do you think it's a good idea for you to have unsupervised, um, access to your children? Honestly? If we let you walk out of here today, right, do you think it's a good idea if she drops the girls off with you for the rest of the week for a stay? Honestly? |
| Crocker: | Yes. |
| Moody: | You think that's healthy for your daughters? You think that's healthy for your children to be giving you blow jobs? Are you kidding me? |
| Crocker: | Well, that's not gonna be happening . . . |
| Moody: | You haven't put a stop to it after all these years. Why would you all of a sudden stop now? Because it's all out here in the open? You're kidding me, right? I mean listen, I'm trying to answer questions for you that I really can't answer, but I'm just asking you, you know. Do you think that's a good idea? |
| Crocker: | Well, once we get to counseling and all that, and what, and it's all out in the open. |
| Moody: | You've had what you've described as at least six years, right, of this kinda shit going on. If you wanted to get your kids counseling, the first time that that happened, and you're saying you woke up, and your dick is in your daughter's mouth, that's when you go get counseling. That's when you go be a father, and say "whoa, whoa, whoa." And then you try and figure out, as the father, why the fuck your two year old is blowing you! So stop all the bullshit crying, and the "pity me, I'm the victim in this." Okay? Because you're not the victim in this. The victim is those two little girls laying right there. That's the victims. You're not a victim. Stop acting like a god damn victim! |
| Crocker: | I'm not acting like a victim. |
| Moody: | You're sitting here, crying, "Oh woe is me. I can't see my kids if it's, if it's supervised." Of course it's going to be supervised! If you ever get to see those kids again, it will be supervised. I'm pretty certain of that. |
| Crocker: | . . . my gosh. |

(GX3 at 1:09:33 to 1:12:40; GX5 at 5-7 (transcript)).

12

### D. The Agents Repeatedly Challenge the Defendant's Claim that He Did Not Distribute Pornographic Videos of His Daughters.

Throughout the interview, the agents made it clear that they did not believe certain aspects of the defendant's story.[4]   One recurring theme was whether the defendant knowingly distributed these videos to others.   (Tr. 36, 38).   Despite the defendant's protests to the contrary, there was evidence that he had done so.

In particular, as the agents knew, a Google+ account in the defendant's name had made a series of postings in an Internet forum that were consistent with trading child pornography.  (Tr. 39-40).   An individual using the name "ToronCrockerDR" indicated that he was interested in distributing child pornography.  (Tr. 40).   In particular, this individual stated that he was into "black 7-12" (black juveniles 7 to 12 years old) and had new material that no one had ever seen before – i.e., homemade child pornography.  (Tr. 40).

Despite the above, however, the defendant maintained that he did not knowingly distribute the videos of his girls to anyone else.   (Tr. 41).   Although he admitted that he uploaded these videos into Dropbox,[5] he claimed that someone "cracked into" his computer and took them without his knowledge.  (GX3 at 19:40 to 20:09).   Specifically, the defendant stated that he provided a third party with his

---

[4] For example, the defendant claimed that he was not sexually aroused during the events he described; the agents played portions of a video that demonstrated otherwise.  (GX3 17:20 to 17:50).

[5] Dropbox is a file sharing/storage platform. While it has a number of legitimate applications, it is frequently used to find and share child pornography. *See* https://www.nytimes.com/interactive/2019/09/28/us/child-sex-abuse.html

email password so that he (the defendant) could receive child pornography; the defendant claimed that this individual must have used the information to access his Dropbox account and obtain videos of his daughters without his consent. (GX3 at 48:24 to 52:12). The agents did not believe this story for a number of reasons, and explained that to the defendant. (GX3 at 55:50 to 56:36).

At approximately the one-hour mark, the agents told the defendant that they would take a break. (GX3 at 1:00:20 to 1:00:45). Special Agent Lipsner indicated that he wanted the defendant to be "honest" about how his daughters' images got "out into the Internet" when they returned. (GX3 at 1:00:45 to 1:00:53). According to Lipsner, those images were out there for a "bunch of really bad dudes to jack off to," and if the defendant wanted to "get it cleaned up" and "do something right for a change" for his little girls, he should "man up" and tell him the truth. (GX3 at 1:00:53 to 1:01:50; GX5 at 3-4 (transcript)). As Officer Moody explained, the agents needed to "backtrack" the images in order to find them.[6] (GX3 at 1:02:00 to 1:02:15; GX5 at 3-4 (transcript).

Special Agent Lipsner then said the following:

> Lipsner:     And here's the thing, if I find out that you're not telling me the truth, I'm going to circle back and I'm gonna charge you with some stuff that will put you in jail for a long, long time, and you will never see those little girls again. I will make sure you never see those little girls again. Because I will not let you use those little girls to your advantage anymore. That day is done, brother. My number one priority right now is to protect, is to protect [the

---

[6] As Agent Lipsner explained at the evidentiary hearing, understanding the details of how child pornography enters into the public domain can be instrumental in its recovery, as well as in treating the victims in the case. (Tr. 36-37, 42).

|           | defendant's girls].   They are the only thing I care about at this instance.   And I will do whatever it takes to protect those little girls and if you can't man up and do it, I will. I will step in, and I will be the man that you aren't.   You understand that? |
|-----------|---|
| Crocker:  | What . . |
| Lipsner:  | So, shut your mouth, take a break, go to the bathroom, get some water, and we're going to try this one more time, and then we're done.   You understand? |

(GX3 at 1:02:15 to 1:03:00; GX5 at 3-4 (transcript).   After a break – and before the

defendant answered any further questions (Tr. 44-45) – Special Agent Lipsner

clarified that it was not his decision to arrest or charge the defendant.     It was the

prosecutor's.   And it would be a judge's decision whether he was released, if arrested.

|           |   |
|-----------|---|
| Crocker:  | I'm so terrified. |
| Lipsner:  | Well, you should be.   And that's understandable.   I'm not, I'm not surprised. |
| Crocker:  | So, I'm getting locked up? |
| Lipsner:  | I don't know yet.   That decision is not my call right now. Okay, that decision is going to be at the base of an attorney who is aware of this case.   And if that attorney based on what we talk about here today feels that you need to come in before a judge, then that could be the case. |
| Crocker:  | So, I'll find that out. . . |
| Lipsner:  | When I place a phone call to the attorney, but I don't want to call that attorney 'til after we're done talking so I can tell him everything, I can tell him the good, the bad, and everything else.   I'm going to give him both sides of the story; I don't hold nothing back.   He gets, he gets the full story.   Okay?   He's not going to have two hours to listen to this conversation, but I'm going to give him the high points. I'm going to give him the points that you tell me work in your favor, and I'm going to tell the attorney about the stuff that doesn't work in your favor, so he can make a fair assessment. |
| Crocker:  | So, he'll decide if I get locked up or not? |
| Lipsner:  | Well, he's going to make a decision whether or not you get arrested.     Whether or not you get locked up or held or anything like that, if that goes that path, that's up to a judge.   A judge makes that call.   Todd and I don't make |

|          | that call.  Our job is just to figure out what's going on . . . and then figure out, um. [phone ringing].  Our job is to figure out and take those facts and then present it to an attorney who can make that call about whether or not you need to go see a judge. |
|----------|-----|
| Crocker: | I'll definitely probably get, uh, charged with that pornography.  Child porn . . . |
| Lipsner: | Well, I don't know about that yet.  I'm going to talk to the attorney when we get done talking, and tell him about this conversation and he'll make that determination.   Okay?  So, hold, hold tight.   We're gonna come back and we're gonna talk about what I told you we're going to talk about, and that's how these videos got out on the Internet and whether . . . how that occurred and whether or not you sent them so I can go try to police  them up to make your little girls safe again.   That's what I'm trying to do here.  You gotta work with me.  If you don't work with me, then I'm going to go at it, but I can't guarantee nothing, okay? |

(GX3 at 1:06:30 to 1:08:22; GX5 at 4-5 (transcript).

### E.   The Defendant's Asks about Leaving to "Get a Lawyer," but Repeatedly Declines to Make a Clear Request for Counsel.

For the ensuing hour, the defendant and the agents went round and round. The defendant continued to claim that he was unwittingly hacked by a fellow child pornography collector; the agents were steadfast in their incredulity.

At the tail end of the interview, the defendant asked if he could "leave to get a lawyer."  The agents then explained that if he wanted an attorney, they would end the interview:

|          |     |
|----------|-----|
| Crocker: | So, could I leave to get a lawyer?  That way he can better . . . |
| Lipsner: | If you feel like that's something you want, we're going to have to stop everything we're doing right now, and we'll just shut everything down.   Is that . . . |
| Moody: | We can't tell you either way, listen. |

16

| | |
|---|---|
| Crocker: | No, what' I'm saying, that way he can help me better explain what's going on, because I just can't talk right now, I'm . . . |
| Lipsner: | If you want an attorney, we can stop.  Do you want an attorney? |

(GX3 at 2:09:55 to 2:10:23).  When specifically asked if he wanted an attorney, the defendant did not request one.   Instead, he questioned whether he would have to be "locked up."   Special Agent Lipsner repeated what he had told him about the process earlier in the interview, and asked again if he wanted an attorney:

| | |
|---|---|
| Crocker: | Will I have to be locked up? |
| Lipsner: | I'm gonna call . .  after we get done talking, either now or whenever . . . if you say you want an attorney, we're gonna stop, and then I'm going to call the U.S. Attorney's Office and I'm going to tell them everything we talked about – the good and the bad – and then they're going to tell me what's going to happen with you.  But, for right now . . . if you want an attorney, that's your right. We read you that right, you could stop answering questions at any time, and that is, so far you've been very cooperative and it's all been good and voluntary.  If you want to stop and get an attorney we'll stop right now, so I'm going to ask you a very simple question:  do you want an attorney? |

(GX3 at 2:10:20 to 2:10:55).  The defendant again failed to answer the question. Instead, he asked what requesting an attorney would "mean" for him.    Lipsner explained:

| | |
|---|---|
| Crocker: | What does that mean for me though? |
| Lipsner: | That means that if you want an attorney, if you want to consult with an attorney, then we just stop, and you have the right to go seek counsel with an attorney, and if you cannot afford one, then the government will help you get an attorney. |
| Crocker: | So, I can leave here. . . |
| Lipsner: | I'm not saying you're going to get to leave, I'm saying you'll get to talk with an attorney. |
| Crocker: | Fuck. |

| Moody: | What, what it means is that if you say you want an attorney, which is completely and entirely up to you, our line of questioning, this conversation, is over with. We're done. We're going to pack all this stuff up. |
| Lipsner: | We can't. We legally can't talk to you anymore. Once you say, "hey I want an attorney," legally we have to stop. And that's okay. I prefer to keep talking with you, but you have rights as a U.S. Citizen, and you have a right to an attorney, and if you want to consult with an attorney, or you can't afford one, the government will help you get one, but we can't talk to you once you say those words. |

(GX3 at 2:10:55 to 2:11:50).

After this explanation, Special Agent Lipsner asked the defendant for the third time: "Do you want an attorney Mr. Crocker?"  After the defendant failed to answer, Lipsner offered an alternative.   He explained that there was a polygrapher on sight, and if the defendant wanted to, he could take a polygraph exam to "confirm" that he was telling the agents the truth.   (GX3 at 2:11:50 to 2:13:25).   The defendant agreed.

## **ARGUMENT**

## I.   **The Defendant's Statement to Law Enforcement Was Voluntary**

In determining whether a confession was voluntarily given, a court must satisfy itself that the statement was the "product of an essentially free and unconstrained choice by its maker, and it was the product of a rational intellect and a free will and that the [defendant's] will was not overborne." *United States v. Swint*, 15 F.3d 286 (3d Cir. 1994).   Stated another way, the question is not whether the agent's statements were the cause of the confession, but whether those statements were "so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." *Miller v. Fenton*, 796 F.2d

18

598, 605 (3d Cir. 1986).  In making this determination, courts look to the totality of the circumstances, including:  the extent of any police coercion;[7] the length of the interrogation; its location; the experience and characteristics of the defendant; and whether the defendant was advised of his constitutional rights.  *Id.*; *Schneckloth v. Bustamonte*, 412 U.S. at 226 (1973).

The law is clear that the police may use psychological tactics in order to obtain a confession.  *Miller*, 796 F.2d at 604-05.   They can also "play on a suspect's ignorance, his anxieties, his fears, and his uncertainties." *United States v. Griggle*, 105 Fed. Appx. 431, 435 (3d Cir. Aug. 6, 2004) (cleaned up).    They simply cannot "magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible."  *Id.* (quoting *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990)).

Here, the defendant claims that his statement was not voluntarily given because the agents falsely promised that "he could avoid 'getting locked up'" and "could see his children" if he agreed to speak with them.  (D.I. 50-1 at 6).  This argument fails for two related reasons.   First, the agents made no such promises to the defendant.   While they repeatedly encouraged him to tell his side of the story, it was with the understanding that the information could lead to potential leniency at a later time from a third party – such as a prosecutor or judge.   These types of

---

[7] The Supreme Court has concluded that "coercive police activity is a necessary predicate" to a finding of involuntariness.  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Thus, a court will not find a confession to be involuntary unless it was the product of "police overreaching."  *Swint*, 15 F.3d at 289.

representations are fair game.   Second, even if the defendant could have inferred a different meaning from some of the agents' comments, the totality of the circumstances demonstrate that his statement was nonetheless voluntary – particularly in light of the fact that he was over 30 years old, had prior (and similar) experience with the criminal justice system, and was advised of his *Miranda* rights at the onset of the interview.

### A.   The Agents Did Not Use False Promises to Coerce the Defendant into Providing a Statement.

The defendant alleges that the agents falsely promised him that he could avoid arrest and be released to see his children if he consented to an interview.  (D.I. 50-1 at 6).   Thus, he argues that his subsequent confession should be suppressed because "any direct or implied promises, however slight" are enough to make a statement involuntary.  (*Id.* (*quoting Bram v. United States*, 168 U.S. 532, 542-43 (1987).  As set forth below, the defendant is wrong on both counts.

To start with, he is incorrect on the governing standard.  The defendant relies on a case from the nineteenth century – *Bram v. United States* – for the rule that "any direct or implied promises, however slight" are enough to make a statement involuntary.  (D.I. 50-1 at 6).  The defendant, however, overlooks the fact that *Bram* has been limited by subsequent law.  As the Third Circuit has explained, *Bram* does not create a "*per se* proscription against promises made during interrogation."  *Miller*, 796 F.2d at 608.   In fact, it "does not matter that the accused confessed because of [a] promise, so long as the promise did not overbear his will."  *Id.*; *see also United States v. Walton*, 10 F.3d 1024, 1028 (3d Cir. 1993) ("Despite some language in early

Supreme Court cases such as *Bram* . . . it is clear that the voluntariness of a confession does not depend solely upon whether it was made in response to promises.").

In the context of a voluntariness analysis, the administration of *Miranda* warnings are important.  When so advised, the defendant is "explicitly" put on notice that he has "a right to remain silent" and that "any statements" could be "used to convict him of a crime." *United States v. Washington*, 431 U.S. 181, 188 (1977).  One who receives such warnings "is in a curious posture to later complain that his answers were compelled," because it is "inconceivable" that such a warning would fail to put him on notice that that he could refuse to answer any question that may incriminate him.  *Id.*; *see also Berkemer v. McCarty,* 468 U.S. 420, 433 n. 20 (1984) (observing that while compliance with *Miranda* does not conclusively establish the voluntariness of a subsequent confession, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."); *McCalvin v. Yukins*, 444 F.3d 713, 721 (6th Cir. 2006) (observing that a confession is "much more likely to be voluntary when it is given after a person knowingly and voluntarily waives his Miranda rights.").

As a result, in cases where *Miranda* warnings are administered, courts generally find the defendant's statement to be voluntary – unless the officers make

direct and false promises that render those warnings a nullity.[8]   For example, in *United States v. Walton* the police gave the defendant their "word" that his statements would not be used against him, and the defendant had no other reason to know that he was the subject of a criminal investigation.  *Walton*, 10 F.3d at 1030. Thus, despite the fact that the defendant there received *Miranda* warnings the prior day, the Third Circuit held that the officers' express representation that their conversation would be "off the cuff" created a situation in which the defendant "was deprived of the ability to understand the consequences of foregoing" those rights.  *Id.* at 1031.

Nothing like that occurred here.  For the most part, the agents merely told the defendant that they wanted to hear his side of the story, and that his truthful cooperation *could* benefit him down the road.[9]   Indeed, throughout the interview, the agents explained that the ultimate decisions regarding the issues that mattered to

---

[8] Tellingly, in a number of cases upon which the defendant relies, the suspects were either not advised of their *Miranda* rights or the court held that their statements were voluntarily given (or both).  *See Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (pre-*Miranda* case); *United States v. Swint*, 15 F.3d 286, 288 (3d Cir. 1994) (no *Miranda*); *United States v. Kontny*, 238 F.3d 815, 818-19 (7th Cir. 2001) (no *Miranda* and statement voluntary); *Miller*, 796 F.2d at 610 (statement voluntary); *United States v. Veilleux*, 846 F. Supp. 149, 154 (D.N.H. 1994) (no *Miranda*); *United States v. Conley*, 859 F. Supp. 830, 834 n.3, 835 (W.D. Pa. 1994) (no *Miranda*).

[9] For example, on several occasions Agents Lipsner told the defendant that the issue was not whether he was going to "get in trouble," it was "how much trouble" he would get in.  (GX3 at 10:27 to 10:36; GX3 at 1:15:06 to 1:16:20 (same) (transcript at GX5 at 7)).  As Lipsner testified on cross examination, in making this statement he was attempting to explain to the defendant that telling the truth – as well as being deceitful – can have an impact "later in court process" through "judges and attorneys." (Tr. 73-74).

him – his arrest, detention, and the ability to visit his girls – were not within their control.   They were up to third parties such as prosecutors,[10] judges,[11] the children's mother,[12] and social services.[13]

As the Courts of Appeal have recognized, these types of comments are appropriate.   It is established law that an investigator may "explain that honesty might be the best policy for a criminal who hopes for leniency from the state." *Miller*, 796 F.2d at 605.  Along this vein, "the circuit courts of appeals have uniformly rejected the contention that a promise to bring cooperation to the attention of the authorities suffices to render a confession involuntary." *United States v. Fraction*, 795 F.2d 12, 14 (3d Cir. 1986); *see also United States v. Walker*, 272 F.3d 407, 412 (7th Cir. 2001) (finding the defendant's statement to be voluntary despite the agent's representation that if the defendant was "cooperative" and "completely honest," it would be "reflected in court" at some point "down the line").   This is true, in part, because stating that a defendant's cooperation could help him down the road with a third party (such as a

---

[10] (GX3 at 1:06:30 to 1:08:22) (Lipsner explaining that it was "his job" to take the "facts" and present them to "an attorney" who can make the "call" about whether the defendant would be arrested).

[11] (GX3 at 1:06:30 to 1:08:22) (Lipsner explaining that a "judge" decides whether the defendant is "locked up" after an arrest).

[12] (GX3 at 37:30 to 39:45) (agents explaining that the mother of the defendant's girls would likely know about his activity because "legally" they may need to tell her, and that "[s]he's their mom and she has to make sure that they're safe").

[13] (GX3 at 1:09:33 to 1:11:35) (Moody explaining that he did not know if the defendant would ever "be around" his girls again, but that it would be unlikely that "law enforcement," the "courts" or "social services" would allow him to have unsupervised contact).

prosecutor or judge) is not really a "promise" at all – i.e., it is not "an offer to perform or withhold some future action within the control" of the agent.  *Fraction*, 795 F.2d at 15.

Nevertheless, the defendant argues that some of the agents' remarks could be considered indirect promises either to release him or allow him to see his children if he continued to talk with them.  (D.I. 50-1 at 7-10).  In so doing, the defendant sidesteps the conditional and hypothetical nature of many of these comments, and ignores their surrounding context.[14]

For example, the defendant argues that, by making the following statement, Special Agent Lipsner indirectly promised the defendant that he could avoid prosecution and see his children by continuing to talk with him:

> And here's the thing, if I find out that you're not telling me the truth, I'm going to circle back and I'm gonna charge you with some stuff that will put you in jail for a long, long time, and you will never see those little girls again.

(GX3 1:02:15 to 1:03:00; GX5 at 3-4 (transcript)).  The defendant fails to mention, however, that shortly after Lipsner said the above – and before the defendant answered any further questions (Tr. 44-45) – the agents clarified that it was not their decision to arrest, charge, or detain the defendant.  (GX3 at 1:06:30 to 1:08:22; GX5 at 4-5 (transcript)).  Moreover, as the agents went on to explain, it was likewise not

---

[14] For example, when explaining what would happen if the defendant requested an attorney, Agent Lipsner said that they "*may* not get a chance to talk again," but if they did it would "*probably* be in a very, very different environment."  (Tr.  5:23 to 5:54) (emphasis added).

their call whether the defendant would see his daughters again (or under what circumstances).   (GX3 at 1:09:33 to 1:12:40; GX5 at 5-7 (transcript)).

But even if the Court were to assume that any of the agents' statements could be seen as indirect promises, the defendant's argument otherwise lacks force.  As the Third Circuit observed in *Miller*, "indirect promises do not have the potency of direct promises."  *Miller*, 796 F.2d at 610.  This is because "[w]hile innuendo might rise to the level of trickery, it is not so likely to break down resistance as is a promise that is spelled out."  *Id.* at 609.  As a result, when agents make indirect promises to a subject who has received *Miranda* warnings, involuntariness findings are rare.  As discussed below, the facts and reasoning of *Miller* illustrate this point with regard to the case here.

### B.   The Totality of the Circumstances Demonstrate that the Defendant's Statement Was Voluntary.

At the time that he spoke with the agents in this case, the defendant was in his early 30s, had prior experience with the criminal justice system, and had some high school education.   He was not under the influence of any drugs or alcohol, he was offered breaks and water, and there is no evidence that he was suffering from a painful physical ailment.  And importantly, he received and waived his *Miranda* rights.   These characteristics are similar to the defendant in *Miller* – a case where the interviewing officers made implied promises that the defendant would not be prosecuted for the crime they were investigating.  *Id.* at 606, 609.

In *Miller*, the defendant was the lead suspect in a brutal homicide.   *Id.* at 600.  Like the defendant here, he knowingly waived his *Miranda* warnings at the onset of

the interview. *Id.* During questioning, a detective repeatedly implied that the defendant would not be prosecuted for his crimes, by stating that he "was not a criminal who should be punished." *Id.* at 602-03. Thereafter, the detective exerted psychological pressure by encouraging the defendant to confess as a form of therapeutic release, with remarks such as:

> Honest, Frank. It's got to come out. You can't leave it in. It's hard for you, I realize that, how hard it is, how difficult it is, I realize that, but you've got to help yourself before anybody else can help you.

*Id.* After an hour of this, the defendant confessed. *Id.* He collapsed in a state of shock thereafter, with a "blank stare on his face." *Id.* at 603.

Despite these circumstances, the Third Circuit held that the defendant's statement was voluntary. Although the court acknowledged that the detective's statements may have conveyed an "implied promise" to the defendant that he "would not be prosecuted," the court reasoned that any such belief was undercut by the *Miranda* warnings he received – "which included the admonition that anything that [the defendant] said could be used against him." *Id.* at 609. "Thus, when the interrogation began," the defendant "knew that if he confessed" to the "murder he could be prosecuted." *Id.*

The same is true here. Even if the Court were to assume the worst with regard to the agents' remarks in this case, the *Miranda* warnings put the defendant on express notice that any statements could be used against him. This alone should carry the day, but there is more.

Several additional factors demonstrate that the defendant' was well aware that he could be prosecuted for his conduct, and that his statements to the agents could be used against him:

- The defendant knew from the outset that the agents had substantial evidence against him about very serious crimes. Early in the interview, the agents showed the defendant a child pornography video that he created, and in which his face is clearly visible. *See supra* text and accompanying notes in Background pp. 2-3, 7-8.

- The defendant knew that he was being audio recorded and made damaging admissions early on in the interview nonetheless. *See supra* text and accompanying notes in Background pp. 3, 7. Importantly, the defendant made these admissions almost immediately after receiving his *Miranda* warnings, and *before* most of the alleged promises/threats at issue in the defendant's motion.

- The agents repeatedly told the defendant that he was in "trouble." *See supra* text and accompanying notes in Background pp. 7-8).

- This was not the defendant's first rodeo. A little over a year before the interview here, the defendant was arrested in connection with a bank robbery investigation. (Tr. 12-13; GX2 at 00000894 (police report)). As in this case, the defendant was read his *Miranda* rights, was provided a waiver form to review, and thereafter consented to an interview. (Tr. 12-13; GX2 at 00000894). After he provided an incriminating statement to the investigating officer, the defendant was arrested, brought before a judge for arraignment, and subsequently remanded to the Howard R. Young Correctional Institution in lieu of bond. (GX2 at 00000895). Thus, the defendant knew from his prior experience that, if he chose to speak with the agents, he could be arrested and incarcerated.

Together, all of these factors demonstrate that the defendant knew the implications of speaking to the agents on the day of his arrest, but did so anyway – and did so voluntarily. As was the case in *Miller*, this is not a "rare" circumstance where the defendant can make out "a colorable argument that a self-incriminating statement

was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda*."   *Berkemer v. McCarty,* 468 U.S. 420, 433 n. 20 (1984).

## II.   The Defendant Did Not Make a Clear and Unequivocal Request for an Attorney.

The defendant also claims that the agents should have stopped questioning him when he asked the following at the tail-end of the interview:  "So, could I leave to get a lawyer?"   (D.I. 50-1 at 14-18).   The defendant is incorrect.  While it is true that a clear and unambiguous request for an attorney requires the interviewing agents to cease questioning, a statement that *"might* be invoking the right to counsel" does not.   *Davis v. United States*, 512 U.S. 452, 459 (1994) (emphasis in original). There was no unambiguous request in this case.  *Id.*

The defendant did not ask for an attorney.   He asked if he could *leave* to get an attorney (he was detained and in handcuffs at the time).  *See infra* at Background, Section E.   The answer to that question was no.   The agent explained that if the defendant wanted an attorney, they would stop the interview and contact the prosecutor for further direction.   *Id.*   Since it was unclear whether the defendant actually wanted a lawyer, the agents followed "good police practice" and sought to clarify.  *Davis*, 512 U.S. at 461.   Thereafter, despite being given the opportunity **three times**, the defendant never requested an attorney.   Under the circumstances, the agents acted in an appropriate manner.  *See id.* at 454 (concluding that "Maybe I should talk to a lawyer" was not a clear request for counsel and that it "was entirely proper" for the agents to "clarify whether [the defendant] in fact wanted a lawyer"); *see also United States v. Briggs*, 347 Fed. Appx. 750, 754 (3d Cir. Oct. 1, 2009)

(defendant's allegation that he stated he did not want to answer questions until he found out of his mother obtained counsel for him, even if true, would not amount to a "sufficiently clear and unambiguous invocation" of right to counsel under *Davis*); *Flamer v. Delaware*, 68 F.3d 710, 725 (3d Cir. 1995) (concluding that defendant's request to call his mother "to inquire about . . . possible representation" was not a clear request for counsel).

## <u>CONCLUSION</u>

For all of the above reasons, the defendant's Motion to Suppress Statements should be DENIED.

Respectfully submitted,

DAVID C. WEISS
United States Attorney

By: <u>/s/ Shawn A. Weede</u>
Shawn A. Weede
Assistant United States Attorney

Dated:  February 11, 2020