**Document Electronically Filed**

```
             UNITED STATES DISTRICT COURT
               DISTRICT OF DELAWARE
```

| | |
|---|---|
| UNITED STATES, Plaintiff<br><br>v.<br><br>Toron Crocker, Defendant | HON. LEONARD P. STARK<br><br>CRIM NO. 17-10-LPS |

**DEFENDANT TORON CROCKER'S POST-HEARING SUPPLEMENTAL BRIEF
IN SUPPORT OF
MOTION TO SUPPRESS STATEMENTS**

**On the brief:**

**ROCCO C. CIPPARONE, JR., ESQUIRE**
*LAW OFFICES OF ROCCO C. CIPPARONE, JR.*
*WWW.CIPPARONELAW.COM*
205 Black Horse Pike
Haddon Heights, NJ 08035

This brief is submitted as a defendant's supplemental post-hearing brief. Defendant Crocker incorporates the arguments (factual and legal) set forth in his opening brief filed September 6, 2019.

**ARGUMENT**

It is indisputable that Mr. Crocker was in custody at the time of his interrogation by the agents on February 8, 2017. He was approached by the agents at the Delaware Department of Probation and Parole and relatively immediately was placed in handcuffs and leg irons. Tr. @ 14-15.[2] As Agent Lipsner testified, Mr. Crocker was in custody, Tr. @ 16, and he was not free to leave from the time he was placed in handcuffs and leg irons through the conclusion of the interrogation by the agents. Tr. @ 65:3-7. Clearly that situation constitutes custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)(custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").

The statements made by Mr. Crocker on February 8, 2017 were not the product of a free and deliberate choice, but instead

---

[2] The references to "Tr." are to the transcript of the hearing which occurred on 01/07/2020.

resulted from sustained intimidation, coercion, and deception by the agents. *Moran v. Burbine*, 475 U.S. 412 (1986)

A law enforcement officer's words or deeds that are likely to cause a suspect to believe he will suffer serious adverse consequences if he does not cooperate, or that he will receive substantial leniency if he does, can render a confession involuntary. *United States v. Walton*, 10 F.3d 1024, 1028-29 (3d Cir. 1993). Here, the coercive tactics of law enforcement render Mr. Crocker's confession involuntary. Mr. Crocker was threatened with incarceration, permanent or lengthy ex-communication from his children, and more harsh charges if he failed to speak to the agents and invoked his right to counsel or to remain silent.

After being told that he was not under arrest, Mr. Crocker was told that if he waited for a lawyer before speaking to the agents, the next time he will be able to speak with agents, will be **"in a very very different environment"**: *i.e.* in jail:

> Q. When you said those words, am I correct, wasn't it your intention to convey to him it will be where you are charged or in jail or some other negative environment?
>
> A. I would say at that point, I was -- I had strong confidence that it would be in some kind of controlled circumstance that, in your words, may be a negative environment. That's correct.
>
> Q. And you were trying to convey that to Mr. Crocker; correct?

2

      A. Yes, sir.

Tr. @ 70:25 – 71:9.

Therefore, Agent Lipsner directly conveyed to Mr. Crocker that the consequence of requesting a lawyer will be that he is locked up (and creating the clear inference that if he speaks with the agents, he may not be locked up). In actuality, Mr. Crocker was going to be taken into (or more aptly here remain in) custody whether or not he requested a lawyer. Tr. @ 67:18 – 70:5.

In addition to the overt threat of incarceration, Agent Lipsner also informed Mr. Crocker that whether he continues to speak with the agents or invokes his constitutional rights, will determine whether or not Mr. Crocker sees his children again. Beginning at the approximate 37 minute mark of the interrogation, Mr. Crocker begins crying that he will never see his kids again. In response, the agent states, "Listen, the question of whether or not you see your kids again – this conversation is going well and **I'd encourage you to keep it going, that could determine whether you see your kids or not.**" At the hearing, Agent Lipsner confirmed that the import of what he said to Mr. Crocker was that failing to continue to speak with the agents on February 8, 2017 would have deleterious effects on his ability to see his children:

3

> Q. Am I correct what you told Mr. Crocker there was if you keep this conversation going, that can determine whether or not you see your kids?
>
> A. That's what I said.

Tr. @ 76:18-21. Indeed, it is clear from statements by Mr. Crocker on the interrogation recording that he perceives exactly what Agent Lipsner and TFO Moody wanted him to perceive: that if he continued to speak with them, he could be reunited with his children. As the exchange went:

> Lipsner: you right now, at the FBI, our main job in this is to make sure that the kids are safe, and that they grow up with good parents. It is best for a child to have a good dad and a good mom.
>
> Crocker: **So you're not going to take me from my kids.**

GX3 at 36:54 – 39:25; GX5 at 3 (transcript excerpt).

On top of the above-referenced threats, Agent Lipsner layered the potent threat that if Mr. Crocker did not provide a "truthful" statement, **Agent Lipsner** would charge him with crimes that will substantially increase the time Mr. Crocker will spend incarcerated. During the interrogation, Lipsner stated that "If I find that you're not telling me the truth, I'm gonna circle back and <u>I'm</u> **going to charge you with some stuff that will put you in jail for a long long time, and you will never see those little girls again. I will make sure you never see those little**

4

**girls again**." GT Exhibit 5 at 4; Tr. @ 76:22 – 78:18 (emphasis added). It is of no moment legally that Agent Lipsner of course does not actually make charging decisions: **what is of moment for this motion is the perception Lipsner conveyed to Mr. Crocker, which was that Lipsner had power over the charging decision** and would insure more consequential charges to incarcerate Mr. Crocker for a very long time unless he continued "truthful" interview. Tr. @ 76:22 – 78:18.

It is clear that Mr. Crocker was intimidated and led by the agents to believe that his speaking to the agents and not requesting a lawyer, based on the representations of the agents, had the power to keep him out of jail (or at a minimum avoid substantially more harsh charges and jail-time penalties) and to allow him to keep contact with his children. It is not until well after the two hour mark, toward the end of the interrogation, that Mr. Crocker realizes he has been misled. At that point, he states, "So, basically I'm not going home today and I'm not going to be around my daughters."

Coercion by law enforcement, including promises of leniency or implications the suspect will suffer adverse consequences, may alone qualify as coercion. "The voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157,

5

170 (1986) (reasoning that the Fifth Amendment is solely concerned with protection from governmental coercion). Either physical **or psychological** coercion by law enforcement may render a *Miranda* wavier involuntary. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986).  Here, the agents' we "so manipulative … [and] coercive that they deprived [Mr. Crocker] of his ability to make an unconstrained, autonomous decision to confess." *Miller*, 796 F.2d at 605.

"[A] confession, in order to be admissible, must be free and voluntary: that is, must *not be* extracted by any sort of threats or violence, nor *obtained by any direct or implied promises, however slight,* nor by the exertion of any improper influence. . . ."  *Bram v. U.S.*, 168 U.S. 532 (1897)(Emphasis added).  Although the government in its brief (GT Brf. @ 20) suggests that the defense citation to *Bram* in its opening brief is somehow misplaced because *Bram* is antiquated, the government ignores that the Third Circuit "repeatedly has acknowledged the continued validity of the *Bram* decision, *see U.S. v. Sibley,* 535 F. Supp. 208 (E.D.Pa.), *aff'd,* 692 F.2d 750 (3d Cir. 1982), and that the Supreme Court itself has continued to cite with approval the specific passage quoted above, *U.S. v. Raddatz,* 447 U.S. 667, 671, 100 S.Ct. 2406, 2410, 65 L.Ed.2d 424 (1980); *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976); *Lefkowitz v. Turley,* 414 U.S. 70,

6

77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973)." *United States v. Fraction*, 795 F.2d 12, 14 (3d Cir. 1986). Here, Mr. Crocker's will was overborne.

Police words or deeds that are likely to cause a suspect to believe he will suffer serious adverse consequences if he does not cooperate, or will receive substantial leniency if he does, can render a confession involuntary. *See Walton*, 10 F.3d at 1029-1030 (agent's promise that defendant could speak "off the cuff" would be understood by a suspect to mean that defendant's statements would not be used against him, rendering the confession involuntary); *United States v. Veilleux*, 846 F.Supp. 149, 154-55 (D.N.H. 1994) (confession held involuntary when defendant was told that nothing he said would be used against him); *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001) (investigator's promise that a suspect would not be prosecuted if he played ball could be the kind of false promise that would overcome the suspect's free will).

In *United States v. Lawrence*, 2008 U.S. Dist. Lexis 107549, the court gathered cases raising concern over any form of threat involving a defendant's children:

> Express threats that a defendant's children will be taken away if she fails to cooperate together with other coercive circumstances have been held to be so intimidating that the defendant's statements were rendered involuntary. *Lynumn v. Illinois*, 372 U.S. 528, 534

7

>(1963). In *Lynumn*, the Supreme Court held a confession involuntary after an express threat by police that the defendant's children would be taken away from her if she did not cooperate. *Id.* at 534-35. The court *in United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) found that similar statements regarding the defendant's children were plainly coercive and threatening, rendering the resulting confession involuntary.

As detailed above, the multiple indications that Mr. Crocker would suffer adverse consequences alone should render his statements involuntary. In addition, a full consideration of the totality of the circumstances only exacerbates the constitutional violation. Mr. Crocker has only a 10th grade education. From the outset of the interrogation, he sounds distressed and emotional. When he is not crying, he is quiet, and his voice can be heard cracking as he holds back tears. He can be heard sniffling. Agent Lipsner acknowledged that Mt. Crocker was upset, nervous and indeed frightened. Tr. @ 56:12-25.

The interrogation is replete with cursing and aggression by the agents toward Mr. Crocker. For example, early in the statement an agent states, "Now's your chance to be a real fucking man and man up and take ownership of some of those

8

things that have occurred (C.S. at 6:43).[3] Agent Lipsner was challenging the defendant's manhood in a demeaning way. Tr. @ 73:3-5; GX5 @ 3-4). While cursing, aggression, and challenges to manhood each in themselves could be considered constitutionally innocuous, when combined with the categories of threats detailed *supra* which were made to Mr. Crocker, in the totality of the circumstances they produced involuntary statements that should be suppressed. Such conduct is in contrast to that of the law enforcement officers in *Miller v. Fenton* (cited above), which the government discussed in its brief at 25-26, in support of its position. In *Miller*, the detective ostensibly was empathetic to the defendant, and genteel explaining that confession could be a therapeutic release, not intimidating, harassing and threatening as were Agent Lipsner and TFO Moody to Mr. Crocker.

The government contends that Mr. Croker failed to exercise a clear invocation of his right to counsel under the Fifth Amendment. However, **the agents** precluded and blocked such[5].

---

[3] Other aspects of the full blown verbal attacks by Agent Lipsner and TFO Moody designed to bring Mr. Crocker into submission are detailed in the defendant's previously filed opening brief.

[5] This argument is not a concession that Mr. Crocker did not make a clear invocation of his rights. AS argued in the defendant's opening brief, he did. Further, if the Court determines that his statements in that regard were not the model of clarity or directness, such is because the agents interrupted, dissuaded, and essentially (figuratively not literally) strong-armed him

9

Mr. Crocker's attempts to invoke his rights were consistently blocked and frustrated by the agents, which amounts to a denial of his 5th amendment rights. Each of Agent Lipsner and TFO Moody's tone at many intervals during the interrogation was inappropriately challenging, demeaning, curse-laden, and most importantly intimidating to Mr. Crocker, as can be ascertained from listening the recording. *Michigan v. Harvey*, 494 U.S. 344 (1990)(interrogation must cease when a defendant has requested an attorney, so that police do not badger a defendant into waiving asserted *Miranda* rights).

Agent Lipsner, a 14 year Army Special Force Officer (Green Beret)[6] certainly was intimidating and indeed tried to be so. Tr. @ 73:3-5. That intimidation factor to Mr. Crocker was magnified by several factors:

> (1) the FBI agents approached Mr. Crocker (without forewarning[7]) at his Delaware Probation Office scheduled appearance (which creates probation/parole violation concerns in the target)(Tr. 13:25-14:1);

---

away from the invocation which they knew he was trying to articulate.

[6] Tr. @ 6:12-14.

[7] Tr. @ 57:19-22. This technique is used to catch targets off-guard, as it did Mr. Crocker. Tr. @ 59:10 – 60: 6.

10

      (2) Mr. Crocker was immediately shackled in handcuffs and leg irons (Tr. @ 15:10), which is intimidating to anyone; and

      (3) Mr. Crocker was forced to be stripped naked, fully exposed, and photographed by two agents in a small room with a closed door, all while he was shackled[8].  Tr. @ 15:15-24; 61:2-4.

Within the first four minutes of the interrogation, Mr. Crocker asks "what if I say I want a lawyer?" Tr. @ 65:20 – 66:5.  In addition to Mr. Crocker's initial question about whether or not he should obtain an attorney, later in the interview, he effectively requests a lawyer. His request is ignored. At approximately the 1:56:20 minute mark Mr. Crocker begins to cry and says it is too hard. The agent immediately cuts him off, "no no no no no **stop. stop.** keep working with me because you're doing good right now. **STOP.**" The defendant becomes audibly anguished, stating that he wants to die right now. From the audio, it is clear that the defendant is no longer facing the agents, and is distraught to the point of mentioning suicide. In response to the defendant's sobs, the agent states, "**If you check out, it's not going to go well for you, so keep talking to me.**" At the 2:10 mark, Mr. Crocker asks if he can

---

[8] The existence of a warrant to do so makes the situation no less intimidating.

11

leave to get a lawyer. He indicates that he needs someone to explain to him what is going on, because he cannot talk right now. In response, the agent states, "I'm going to ask you a simple question, "do you want an attorney, Mr. Crocker?" But, before Mr. Crocker even can respond to the question, he is cut off. The agent states, "**before the words come out of your mouth**, here's something I would like you to think about."

Essentially each time Mr. Crocker approached or sought to exercise his right to counsel, Agent Lipsner told him all of the bad things that would happen to him if he exercised that right, or just cut Mr. Crocker off and did not revisit the subject. Agent Lipsner or TFO Moody variously told Mr. Crocker that if he chose to speak with an attorney:

- ➢ The agents' recommendations to the prosecutor would only be based on half of the story (Tr. @ 66:22 – 67:2);
- ➢ That the next time the agents see or speak with him, it would be in a more negative environment (*i.e.* jail) (Tr. @ 70:14 – 72:14[9])

---

[9] The Court should take note of Agent Lipsner's evasiveness in responding to the relevant questions on this issue on cross-examination (as he did throughout the cross-examination, in contrast to his demeanor on direct examination) to determine that Lipsner is not merely an unbiased agent not aligned with a particular position, and in assessing his credibility adversely. *See also e.g.* Tr. @ 76:22 – 78:18.

12

> ➢ That he could take a polygraph, completely ignoring again an inquiry by Mr. Crocker about his right to counsel, which in context the Court should find constitutes an invocation of that right.  Tr. 86:11 – 94:6.[10]

Indeed, Agent Lispner acknowledged (grudgingly on cross-examination) that he cut off Mr. Crocker's inquiries about counsel because he wanted the interview to continue and to get whatever information he could from Mr. Crocker.  Tr. @ 93:21 – 94:6.  The agent goes on to offer a polygraph exam as a tool to extract a confession.  Tr. 94:10-15.

Here, at a minimum based on three occasions, this Court should be concerned over the badgering of Mr. Crocker. When within the first minutes of the interview, Mr. Crocker questioned whether or not he should get an attorney, the response was, "**before you say that**, I want you to hear what I have to say, and **don't say a word**." Later on, when Mr. Crocker began to struggle, and stated that it was getting too hard, the response was, "no no no no no no **stop**. Keep working with me because you're doing good right now. **STOP**." Finally, when Mr. Crocker asked to leave to get a lawyer, he was asked to confirm if he wanted an attorney. Before he could even answer, he was

---

[10] This referenced exchange also is another example of Agent Lipsner's evasiveness during cross-examination.

13

cut off again: "**before the words come out of your mouth**, here's something I would like you to think about …."

These actions by the agents fall squarely within the concern raised by *Michigan v. Harvey*. Here, Mr. Crocker was repeatedly cut off at any time he began to request an attorney or to state that he did not wish to continue speaking. The agents were aware that Mr. Crocker wanted counsel. Rather than immediately to honor that constitutional right, or even to allow Mr. Crocker the opportunity to answer their clarifying question, the agents forced the conversation forward. No excuses should or can be made for the agents skating over Mr. Crocker's request for an attorney. A review of the entirety of the statement and circumstances demonstrates that this was a strategy in place all along, to cut Mr. Crocker off prior to making any such request: "before the words come out of your mouth," "before you say that," "Stop," "Don't say a word".

The agents violated Mr. Crocker's *Miranda* Rights. Therefore, the statements must be suppressed.

        Respectfully submitted,
        **Law Offices of Rocco C. Cipparone, Jr.**

        By: /s/ Rocco C. Cipparone, Jr.
            Rocco C. Cipparone, Jr.
            Attorney for Defendant

Dated: February 19, 2020