IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | : Crim. No. 17-10-LPS |
| TORON O. CROCKER, | : |
| Defendant. | : |

David C. Weiss, United States Attorney, and Shawn A. Weede, Assistant United States Attorney, District of Delaware, Wilmington, DE

    Attorneys for the United States

Rocco C. Cipparone, Jr., LAW OFFICES OF ROCCO C. CIPPARONE, JR., Wilmington, DE

    Attorney for Defendant

**MEMORANDUM OPINION**

September 1, 2020
Wilmington, Delaware

**STARK, U.S. District Judge:**

Defendant Toron Crocker ("Crocker" or "Defendant") has been indicted for production of child pornography in violation of 18 U.S.C. § 2251(a) and (e). (D.I. 6) He has moved to suppress the statements he gave to law enforcement on February 8, 2017. (D.I. 50) ("Motion")[1] The Court held an evidentiary hearing on the suppression issue on January 7, 2020. (*See* D.I. 60) ("Tr.") The Court also received pre-hearing and post-hearing briefs (*see* D.I. 50-1, 55, 57, 61, 62) and reviewed the recording of Defendant's post-arrest statement, admitted as GX3 during the evidentiary hearing. (Tr. 18-19; *see also* D.I. 57)

For the reasons set forth below, the Court will deny Crocker's Motion.

## I. BACKGROUND

Federal Bureau of Investigations ("FBI") agents participating in Operation Rescue Me recovered and investigated two videos involving child pornography in Virginia and Georgia. (Tr. 8-9) The agents were able to identify Defendant in the videos. (Tr. 9-11) They eventually identified the pre-pubescent girl in both videos as Defendant's youngest daughter, who was 10 or younger at the time the videos were made. (Tr. 11)

FBI Special Agent Michael Lipsner and Task Force Officer Todd Moody obtained a search warrant for Defendant's residence and person. (Tr. 12-14) They executed the warrants on February 8, 2017, including by meeting with Defendant in a conference room at a state probation and parole office, where Defendant had reported as part of his ongoing term of

---

[1] Defendant's September 16, 2019 Motion is an omnibus motion, seeking various types of relief on multiple grounds. The parties resolved all aspects of the Motion other than the suppression portion addressed by this Memorandum Opinion. (*See* D.I. 60 at 98)

2

probation.[2] (Tr. 12-14, 57) The agents also sought to interview Crocker, and he agreed to be interviewed. (Tr. 17)

Crocker was detained and placed in handcuffs and leg cuffs during the interview. (Tr. 16-17) It was audio-recorded. (Tr. 18) Crocker was advised that he could take breaks at any time. (Tr. 20-21; GX3 at 00:30-00:50) Ultimately, the interview lasted for approximately two hours and forty minutes. (*See generally* GX3)

At the start of the interview, the agents read Defendant his *Miranda* warnings from an FBI FD-395 form:

> Agent: Before we ask you any questions here, you have to understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer to ask for advice before we ask you any questions. You have a right to have a lawyer with you during questioning. And if you can't afford a lawyer, one will be appointed to you before we ask you any questions, um, if you want one. All right, do you understand those rights as I have read them to you?
>
> Defendant: Yes.

(Tr. 21-23; GX3 at 2:08-38)

Subsequently, the agents asked Defendant's educational level (he had completed 10th grade) and learned that he could read. (GX3 at 2:38-44) The agents confirmed that Defendant was not under the influence of drugs or alcohol (GX3 at 3:07-15) and then asked him to read each provision of a written copy of the *Miranda* waiver (Tr. 23; GX3 at 3:57-4:11). Defendant

---

[2] Crocker's criminal history includes a 2015 arrest by the Delaware State Police. (Tr. 12-13) In connection with that arrest, he was read his *Miranda* rights and was provided a waiver form to review. (Tr. 12-13) He then consented to an interview, provided an inculpatory statement, was arrested, brought before a judge for arraignment, and then remanded to the Howard R. Young Correctional Institution in lieu of bond. (GX2 at 0894-95)

3

read and signed the form. (Tr. 23; GX3 at 4:15-35; GX4) The agents did not tell Defendant that his statements would not be used against him, or that if he gave a statement he would not be prosecuted. (Tr. 24)

After reading and signing the form, Crocker asked the agents, "[w]hat if I say I want a lawyer?" (GX3 at 4:40-5:23) The agents responded that the decision was up to him, but added that if requested a lawyer, the agents would not have the opportunity to hear his side of the story. (GX3 at 5:23-53) The agents explained that if Defendant chose to seek an attorney, the next time they would speak to him would be in "some kind of controlled circumstance," by which they meant jail or a proffer room. (Tr. 27-28, 70-71) Crocker did not request an attorney and chose to continue the interview. (GX3 at 5:23-53)

As the interview continued, Defendant admitted to producing child pornography using both of his daughters. (Tr. 29-30; GX3 at 12:30-14:16) He claimed that it was daughters' idea. (Tr. 53; GX3 at 14:21-52, 16:00-46) Defendant denied intending to distribute the pornographic videos. (Tr. 36, 38-39, 40-41) He claimed, instead, that someone had hacked into his computer and taken, without his knowledge, the pornographic videos of his daughters that he had uploaded to Dropbox. (GX3 at 19:40-20:09)

After an hour of questioning, the agents took a break. (GX3 at 1:02-03:00) After the break, the agents explained to Defendant that it would not be their decision to arrest or charge him and that this would be up to a prosecutor. (GX3 at 1:06:30-08:22)

When Defendant expressed his concern about seeing his children again, the agents did not tell him that he would be released to see them. (Tr. 31) They did state, however, that being truthful with them might help him to get to see his daughters, but, in all likelihood, any visit would have to be supervised. (GX3 at 1:09:33-11:35; *see also id.* at 36:54-39:25 ("Listen, the

4

question of whether or not you see your kids again is, this conversation is going well, and I'd encourage you to keep it going. That could determine whether or not you see your kids or not."))

After about another hour of interview, Crocker asked if he could "leave to get a lawyer," as detailed below:

> Crocker: So, could I leave to get a lawyer? That way he can better . . .
>
> Agent: If you feel like that's something you want, we're going to have to stop everything we're doing right now, and we'll just shut everything down. Is that . . . .
>
> Agent: We can't tell you either way, listen.
>
> Crocker: No, what I'm saying, that way he can help me better explain what's going on, because I just can't talk right now, I'm . . . .
>
> Agent: If you want an attorney, we can stop. Do you want an attorney?

(GX3 at 2:09:55-10:23) In response, Crocker did not request an attorney. Instead, he asked the agents, "[w]ill I have to be locked up?" (GX3 at 2:10:25) The agents answered that "if you say you want an attorney, we're gonna stop" and that they would then call the U.S. Attorney's Office. (GX 3 at 2:10:34) The agents continued:

> But, for right now . . . if you want an attorney, that's your right. We read you that right, you could stop answering questions at any time, and that is, so far you've been very cooperative and it's all been good and voluntary. If you want to stop and get an attorney we'll stop right now, so I'm going to ask you a very simple question: do you want an attorney?

(GX3 at 2:10:42-55)

Again, Crocker did not ask for an attorney. Instead, he asked the agents what requesting an attorney "would mean" for him. (GX3 at 2:10:55-11:50) The agents answered that the

5

interrogation would "just stop" and Defendant would "have the right to go seek counsel with an attorney." (GX3 at 2:11:04-08) The agents further explained that requesting an attorney would not mean he had the ability to leave. (*Id.*) Instead, they said:

> What it means is if you say you want an attorney, which is completely and entirely up to you, our line of questioning, this conversation is over with. We're done. We're going to pack all this stuff up. Can't talk to you anymore. Once you say I want an attorney, we legally have to stop.
>
> And that is okay. I prefer to keep talking with you, but you have rights as a U.S. citizen and you have a right to an attorney, and if you want to consult with that attorney and you can't afford one, the government will help you get one, but we can't talk to you once you say the words.
>
> Do you want an attorney, Mr. Crocker?
>
> Before the words come out of your mouth, here is something else I would like you to think about.

(GX3 at 2:11:17-12:01)

Crocker did not answer. The agents then offered as an alternative that he take a polygraph test on site. (GX3 at 2:12:01-13:23) He agreed to take the polygraph exam and the interrogation ended shortly thereafter. (GX3 at 2:13:23-21:19, 2:40:07)[3]

## II.  LEGAL STANDARDS

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be compelled in any criminal case to be a witness against himself." Accordingly, "it is clear that 'only voluntary confessions may be admitted at the trial of guilt or innocence.'" *United States v.*

---

[3] Like the parties, the Court cites and discusses only selected portions of the lengthy transcript of the two-plus hour interrogation. In making its findings of fact and conclusions of law, the Court has carefully considered the totality of circumstances, including the full content of the entirety of the interrogation.

*Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994) (quoting *Lego v. Twomey*, 404 U.S. 477, 478 (1972)). If a person's will is overborne or his capacity for self-determination critically impaired, the person's statements are involuntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973).

The burden is on the government to prove voluntariness of a defendant's statement by a preponderance of the evidence. *See Lego*, 404 U.S. at 489. Whether a defendant's confession was voluntary is based on the totality of the circumstances of the interrogation, including any "police coercion, the length of the interrogation, its location, its continuity, [and] the defendant's maturity, education, physical condition, and mental health." *Swint*, 15 F.3d at 289 (internal citations omitted); *see also United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (identifying as factors suspect's background, experience, and prior dealings with criminal justice system).

Coercive law enforcement activity is a crucial factor and necessary predicate for a finding of involuntariness. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also* D.I. 55 at 16 n.3. "Although there is no precise definition of 'coercive police activity,' the Supreme Court has identified the following examples as constituting such: interrogating the defendant for four hours while incapacitated and sedated in intensive care unit; interrogating a medicated defendant for over eighteen hours without food or sleep; holding a gun to the head of a wounded defendant to extract a confession; interrogating a defendant for sixteen days in a closed cell without windows, limited food, and coercive tactics; and holding a defendant for four days with inadequate food and medical attention." *Evans v. Phelps*, 2012 WL 1134482, at *9 (D. Del. Apr. 2, 2012).

A suspect wishing to invoke his right to counsel must do so unambiguously. *See Davis v. United States*, 512 U.S. 452, 459 (1994) (holding that (1) if suspect makes ambiguous or equivocal reference to attorney, cessation of questioning is not required but, rather, suspect must

unambiguously request counsel, and (2) accused's remark, "[m]aybe I should talk to a lawyer," was not unambiguous request for counsel). Once a defendant in a custodial interrogation invokes his right to counsel, all questioning must stop and may not begin again "until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* at 458. However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," cessation is not required. *Id.* at 459.

## III. DISCUSSION

Defendant argues that his statements to the agents were involuntary, as a result of sustained "'intimidation, coercion, or deception'" by the agents. (D.I. 62 at 2) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)) He further contends that he invoked his right to counsel, thereby obligating agents to stop the interrogation, but then the interview continued improperly.

The government disputes Defendant's contentions. In particular, the government emphasizes that Defendant was given proper *Miranda* warnings and insists that agents made him no promises and used no coercion. Moreover, in the government's view, Defendant never made a "'clear and unequivocal request for counsel.'" (D.I. 61 at 28) (citing *Davis*, 512 U.S. at 459)

Based on the evidence, including the testimony of Agent Lipsner at the hearing[4] and the full transcript and recording of the agents' interrogation of Crocker, the Court finds that the government has met its burden of proof. Specifically, the government has proven that Crocker's statements were made voluntarily, as the agents did not make promises to Crocker or use coercion and the totality of circumstances demonstrate Crocker's will was not overcome.

---

[4] Defendant asks the Court to "take note of Agent Lipsner's evasiveness" in his testimony and "assess[] his credibility adversely." (D.I. 62 at 12 n.9) The Court did not find Lipsner to lack credibility.

8

Finally, throughout the interrogation, Crocker never clearly and unambiguously invoked his right to counsel.

### A. Custodial Interrogation

When a defendant is subjected to custodial interrogation, he is entitled to receive from law enforcement certain preliminary warnings regarding his or her constitutional rights. *See Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A custodial interrogation is one in which questioning is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id.* Whether an individual is in custodial status "must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004).

Here, the parties agree that the February 8, 2017 interview of Crocker was a custodial interrogation. (*See* D.I. 50-1 at 2-4; D.I. 55 at 3, 23; D.I. 61 at 3) Throughout the interview, Crocker was in handcuffs and leg restraints, in a conference room of the access-controlled probation and parole office. (*See* Tr. 14-17, 65) A reasonable person in Crocker's situation would believe himself to be in custody.

### B. *Miranda* Warnings

"[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkhemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). Here, it is undisputed that agents read the *Miranda* warnings to Crocker before he gave any portion of the statement he now seeks to suppress. (Tr. 21-23; GX3 at 2:08-38, 3:57-4:11, 4:15-35, 4:40-5:53, 2:09:55-10:23) It is further undisputed that, after doing so, the agents gave Crocker a written

9

version of the *Miranda* warnings, which Crocker read and then signed to indicate he understood them. (GX4)

The repeated *Miranda* warnings are not dispositive, but they do go a long way toward making out the government's burden to show that Crocker's statement was voluntary.

### C. Voluntariness

#### 1. Promises

Crocker contends that the agents induced him to waive his right to counsel and make involuntary, incriminating statements by making express or implied promises to him. In particular, he suggests that he was told that his ability to see his children again, or the seriousness of the charges he would confront, or how long he would remain detained or eventually be sentenced would all depend on his agreement to keep talking to law enforcement without the assistance of counsel. As explained further below, such promises, if made, would not necessarily lead to a conclusion that his statement was involuntary. As importantly, however, is the fact that the agents did not make any promises to Crocker.

Crocker relies on *Bram v. United States*, 168 U.S. 532, 542-43 (1897), for the proposition that "any direct or implied promise, however slight" is enough to make a defendant's statement involuntary. (D.I. 62 at 6; D.I. 50-1 at 6) However, as the government correctly points out, the Third Circuit has made clear that *Bram* does not create a "per se proscription against promises made during interrogation." *Miller v. Fenton*, 796 F.2d 598, 608 (3d Cir. 1986). The issue is whether the promise did – or did not – overbear the defendant's will. *Id.*; *see also United States v. Walton*, 10 F.3d 1024, 1028 (3d Cir. 1993) ("Despite some language in early Supreme Court cases such as *Bram* . . . it is clear that the voluntariness of a confession does not depend solely upon whether it was made in response to promises."). Accordingly, here, even if one were to

10

read the interrogation as involving the agents making at least an implied promise to Crocker, more would be needed to support a finding that his statement was involuntary. That "more" is lacking here.

In any case, careful review of the interrogation makes clear that, as the government contends, the agents did not make any promise to Crocker that he "could avoid getting locked up" or "could see his children" if only he continued to speak with them without the assistance of an attorney. (D.I. 61 at 19) The transcript does not reveal any point at which they "offer to perform or withhold some future action within the[ir] control . . . in circumstances where the resulting action or inaction will have an impact upon the [defendant]." *United States v. Fraction*, 795 F.2d 12, 15 (3d Cir. 1986). Instead, the agents encouraged Crocker to tell them his side of the story and explained that he might, consequently, receive leniency at a later time from a prosecutor or judge. (D.I. 61 at 19; Tr. 46, 73-74)[5] The agents' "promise" to bring Defendant's cooperation to the attention of the authorities is insufficient to render the confession involuntary. *See Fraction*, 795 F.2d at 14 ("[T]he circuit courts of appeals have uniformly rejected the contention that a promise to bring cooperation to the attention of the authorities suffices to render a confession involuntary.").

The agents further explained to Crocker that the issue was not whether he was going to "get in trouble" but "how much trouble he would get in." (GX3 at 10:27-36, 1:15:06-16:20) They also made clear to Crocker that they already had substantial evidence of his guilt and that they did not believe everything he was saying. (*See, e.g.*, GX3 at 06:00-06:40) ("[Y]ou know

---

[5] The government highlights how throughout the interrogation, the agents explained that the ultimate decisions regarding arrest, detention, child visitation, and specific criminal charges were not within their control, but rather (1) the prosecutors (GX3 at 1:06:30-08:22), (2) judges (*id.* at 1:06:30-08:22), (3) the children's mother (*id.* at 37:30-39:45), and (4) social services (*id.* at 1:09:33-11:35). (*See also* D.I. 55 at 17-18)

11

why we're here right now. . . . [W]e know some stuff's been going on that hasn't been right.") The agents made clear from the start of the interview that they already had substantial evidence against him, including the videos he allegedly created. (GX3 at 7:50-8:05, 12:30-14:16) The agents also made clear they did not believe everything he said, including his denial of intentionally sharing his videos with others and his suggestions it was his daughters' idea to engage in sex acts with him. (*See, e.g.*, D.I. 55 at 9-13 (citing, *e.g.*, GX3 at 17:20-50, 55:50-56:36); *see also* GX3 at 1:02:15-1:03:00 ("If I find that you're not telling me the truth, I'm gonna circle back and I'm going to charge you with some stuff that will put you in jail for a long time, and you will never see those little girls again. I will make sure you never see those little girls again."); *id.* at 1:09:33-12:40) Defendant, or a reasonable person in Defendant's position, could not have believed he was being promised that if he continued to talk he would or might walk out of the interview and return to him life and children.

The agents did not make either direct or implied promises that rendered the *Miranda* warnings null. Unlike in *Walton*, 10 F.3d at 1028, a case relied on by Crocker, the agents did not tell Defendant that his statement would not be used against him. (*See* Tr. 23-24; *see also Walton*, 10 F.3d at 1028 (holding that government officers' express representation that conversation with defendant would be "off the cuff," and promise that defendant's statements would not be used against him, created situation in which defendant "was deprived the ability to understand the consequences of foregoing" those rights)). Instead, the repeated *Miranda* warnings told Crocker that his statements could be used against him and nothing to the contrary was said by the agents to Defendant at any point during the interrogation.

### 2. Coercion

Crocker contends that the agents used coercive tactics that render his confession involuntary. (D.I. 62 at 3) The alleged tactics include threats of incarceration, permanent or lengthy ex-communication from his children, and harsh criminal charges, all of which would result if he failed to speak to the agents. (*Id.* at 3-5) Specifically, Crocker argues that the agents' statement that – if he were to seek counsel – the next opportunity for them to speak to him would be "in a very different environment," such as jail, was coercive. (*Id.*) (citing Tr. 70-71) He further argues that the agents implied that his cooperation would determine whether he could see his children again. (Tr. at 76) He adds that the agents represented they had charging power – for example, by threatening Defendant with harsher charges, incarceration "for a long time," and explaining that he may never get to see his children again. (Tr. 76-78)

Crocker also points out that the agents intentionally approached him without forewarning at his scheduled probation appearance, in order to catch him off guard. (D.I. 62 at 10) (citing Tr. 13-14) They preceded the interrogation by executing a warrant, which required him to be undressed and photographed. (Tr. 15, 61) Additionally, Crocker has only a 10th-grade education and was distressed and emotional during portions of the interrogation. (Tr. 56; *see also* D.I. 62 at 11 (citing to portions of transcript in which Defendant is audibly anguished and mentions suicide) The agents also used aggressive language and intimidating conduct at some points during the interrogation. (D.I. 62 at 8-9) (citing Tr. 73) According to Crocker, all this combined to overbear his will, as "the agents were 'so manipulative . . . [and] coercive that they deprived [him] of his ability to make an unconstrained, autonomous decision to confess.'" (D.I. 62 at 6-7) (citing *Miller*, 796 F.2d at 605)

13

Law enforcement is permitted to use psychological tactics in eliciting a statement from a suspect. *See Miller*, 796 F.2d at 605 ("For example, the interrogator may play on the suspect's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency from the state. . . . These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary."). "[T]he police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible." *United States v. Griggie*, 105 Fed. App'x 431, 436-37 (3d Cir. 2004) (internal quotation marks omitted). The Court finds that nothing impermissible occurred during the interrogation and further finds no evidence that the agents used coercive tactics that could (or did) overcome Crocker's ability to exercise judgment and make a voluntary statement.

### 3. Totality of the Circumstances

Ultimately, whether a defendant waived his *Miranda* rights and made a statement voluntarily is evaluated based on the totality of the circumstances. *See United States v. Price*, 558 F.3d 270, 277-78 (3d Cir. 2009). The Court's considerations include any police coercion, the length of the interrogation, the location of the interrogation, the experience and characteristics of the defendant, and whether the defendant was advised of his constitutional rights. *See Schneckloth*, 412 U.S. at 226. The details relating to many of these considerations are addressed above.

Considering the totality of the circumstances, the Court finds that the agents' interrogation here was not "so manipulative or coercive that they deprived the Defendant of his ability to make an unconstrained, autonomous decision to confess." *Miller*, 796 F. 2d at 605.

There is no indication that, under the totality of the circumstances, Defendant "was unable to make an intelligent choice between giving an inculpatory statement, a non-inculpatory statement, or no statement at all." *Griggie*, 105 F. App'x at 436-37.

As the government accurately summarizes:

> At the time that he spoke with the agents in this case, the defendant was in his early 30s, had prior experience with the criminal justice system, and had some high school education. He was not under the influence of any drugs or alcohol, he was offered breaks and water, and there is no evidence that he was suffering from a painful physical ailment. And importantly, he received and waived his *Miranda* rights.

(D.I. 61 at 25) Additionally, as explained above, the agents made no implied or explicit promises and did not use improper coercion.

Accordingly, the Court finds that the government has proven, by a preponderance of the evidence, that the totality of circumstances demonstrate that Crocker waived his *Miranda* rights and that his statement was made voluntarily.

### D.  Request for Counsel

Crocker contends that the government failed to honor his request for counsel. (D.I. 50-1 at 14-18) He argues that, in context, his statements, "[w]hat if I say I want a lawyer" (GX3 at 4:40-5:23) and "[s]o, could I leave to get a lawyer" (*id.* at 2:09:55-10:23), are clear invocations of his right to counsel. (D.I. 50-1 at 14-15) He says he was cut off before he could complete his request for counsel, when agents pressed the conversation forward. (*See, e.g.*, D.I. 50-1 at 16-18; D.I. 62 at 11 (citing GX3 at 1:56:20, 2:10:55-13:25)) On the last of the occasions on which counsel was discussed, Crocker asserts that before he could affirmatively confirm he wanted an attorney, the agents offered that he take a polygraph test and then did not revisit the subject of his

15

right to counsel. (GX3 at 2:10:55-13:25) ("[Before the words come out of your mouth, here's something I would like you to think about . . . .")

According to Defendant, the agents' tone was "inappropriately challenging, demeaning, curse-laden, and most importantly, intimidating," including when he was requesting counsel. (D.I. 62 at 10; *see also id.* at 9 ("Agent Lipsner was challenging the defendant's manhood in a demeaning way.")) For example, early in the interview, when Crocker questioned whether he should get an attorney, the agent's response was to cut him off, stating "before you say that, I want you to hear what I have to say, and don't say a word." (GX3 at 4:40-5:23) According to Defendant, when he became upset during the interview, the agent's response – "no no no no no, stop. Keep working with me because you're doing good right now" – was badgering. (GX3 at 1:56:20) What should have happened instead, in Crocker's view, is that the interrogation should simply have stopped. *See Michigan v. Harvey*, 494 U.S. 344, 350 (1990) ("[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.") (citing *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)); *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). To Defendant, the agents "intentionally failed to honor a request for counsel," and therefore violated Defendant's *Miranda* rights. (D.I. 50-1 at 18)

The Court finds, however, that at no point did Crocker make a clear and unequivocal request for an attorney. The topic of whether Crocker might want to request an attorney did come up, several times. During the interrogation, Defendant was asked three times if he would like to speak with an attorney, yet the record reflects that Defendant never requested one. (*See, e.g.*, GX3 at 4:40-5:23, 2:09:55-10-23, 2:10:55-11:50) When Agent Lipsner asked Defendant

16

"point blank" whether he wanted an attorney (Tr. at 93-94), Defendant did not make a clear and unambiguous request for one. Instead, he asked if, by requesting an attorney, he would be "locked up," if he "could leave," and what requesting an attorney "mean for me." (GX3 at 2:09:55-2:11:50)

At one point, Crocker asked if he could leave the interview to go get an attorney. The agents responded by confirming that, no, he could not leave, and that if he wanted an attorney they would stop the interview and contact the prosecutor for further direction. (GX3 at 2:09:55-11:50) In doing so, the agents acted in accordance with "good police practice" by clarifying with Defendant if he wanted an attorney, and he never affirmatively requested one. *See Davis*, 512 U.S. at 461.

An accused's statement that "***might*** be invoking the right to counsel" does not require agents to cease interviewing. *Davis*, 512 U.S. at 459. Defendant's statements are similar to those made in *Davis*, where the defendant said "[m]aybe I should talk to a lawyer," which the Supreme Court held was not a clear request for counsel. *Id.* at 462. Likewise, in *United States v. Briggs*, 347 Fed. App'x. 750, 754 (3d Cir. Oct. 1, 2009), the Third Circuit affirmed the district court's holding that a defendant's statements that he was "going to wait and see if his mother got [him] . . . an attorney," and that he wanted to call his mother to see if she retained an attorney for him, did not amount to clear, unambiguous requests for counsel which would trigger *Miranda* rights and require cessation of questioning under *Davis*. *See also United States v. Pelle*, 2006 WL 2528552, at *7-8 (D.N.J. Aug. 31, 2006) (finding no clear assertion of right to counsel in defendant's statements "I don't want to sign anything right now. I think you people should leave until I consult with my attorney").

17

Thus, the agents did not violate Crocker's rights when they continued to interrogate him, even after the topic of whether he might request counsel came up in their discussion.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Statements is denied. An appropriate Order follows.

18